**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**THOMAS B.,**

                    **Plaintiff,**

        v.                                                    **5:21-CV-508**
                                                              **(FJS)**

**COMMISSIONER OF SOCIAL SECURITY,**

                    **Defendant.**

---

**APPEARANCES**                          **OF COUNSEL**

**OFFICE OF PETER W. ANTONOWICZ**        **PETER W. ANTONOWICZ, ESQ.**
148 West Dominick Street
Rome, New York 13440
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**       **MOLLY CARTER, SAUSA**
6401 Security Boulevard
Baltimore, Maryland 21235
Attorneys for Defendant

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Thomas B. brought this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g) (the "Act"), seeking judicial review of a final decision of the Commissioner of Social

Security (the "Commissioner"), denying his application for benefits.  *See generally* Dkt. Nos. 1,

11.  Pending before the Court are the parties' cross-motions for judgment on the pleadings

brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  *See* Dkt. Nos. 11, 16.

## II. PROCEDURAL HISTORY AND BACKGROUND

Plaintiff brought his current claim for disability insurance benefits and supplemental security income on July 31, 2015, alleging disability as of January 1, 2012. *See* Dkt. No. 8, Administrative Record ("AR"), at 327.[1]  Defendant initially denied Plaintiff's claim for benefits on October 23, 2015. *See id.* at 171.  Plaintiff then filed his first request for a hearing on November 6, 2015. *See id.* at 184.  Plaintiff appeared for a hearing on December 13, 2017, with his attorney, and a vocational expert ("VE") testified. *See id.* at 71-123.

The Administrative Law Judge ("ALJ"), Gretchen Greisler, issued a decision on January 5, 2017, in which she concluded that Plaintiff was not disabled and that jobs existed in significant numbers in the national economy that Plaintiff could perform. *See id.* at 141-153. Notably, ALJ Greisler found that Plaintiff suffered from the following severe impairments: depressive disorder, posttraumatic stress disorder, anxiety disorder, cognitive disorder/traumatic brain injury, Asperger's syndrome, and obesity. *See id.* at 144.  In light of these impairments, ALJ Greisler found that Plaintiff had the following residual functional capacity ("RFC"):

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that Plaintiff "must be allowed to change position and move for at least 5 minutes after sitting for 45 minutes, but retains the ability to remain on task.  [Plaintiff] can occasionally stoop, bend, crouch, kneel, crawl and climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  [Plaintiff] can perform simple, routine and repetitive tasks.  He can tolerate a low level of work pressure defined as work not requiring multitasking, detailed job tasks, significant independent judgment, a production rate pace, production quotas, sharing of job tasks or contact with the public.  [Plaintiff] can tolerate few, if any, workplace changes.  [Plaintiff] can tolerate occasional interaction with supervisors and coworkers.  [Plaintiff] cannot tolerate exposure to extreme cold.

*See id.* at 146.

---

[1] All references to page numbers in the Administrative Record are to the Bates Stamp numbers in the bottom right corner of those pages.  All references to page numbers in other documents in the record are to the page numbers that the Court's ECF system generates, which appear in the top right corner of those pages.

The Appeals Council granted Plaintiff's request for review on September 24, 2019, and remanded his case to another ALJ to resolve various issues. *See id.* at 161-163. First, the Appeals Council noted that ALJ Greisler found Plaintiff's obesity to be a severe impairment, but she did not consider Plaintiff's obesity within the context of Social Security Ruling 02-1p. *See id.* at 161. Since ALJ Greisler issued her decision, Social Security Ruling 19-2p replaced Ruling 02-1p, and the Appeals Council ordered the new ALJ to further consider Plaintiff's obesity within the context of the new ruling. *See id.* at 161-162. The Appeals Council additionally noted that ALJ Greisler assigned great weight to the opinion of consultative examiner Elke Lorensen, M.D., who found that Plaintiff would have moderate restrictions for reaching; yet, ALJ Greisler's RFC assessment did not including any limitation for reaching or explain why there was no limitation. *See id.* at 161. Similarly, the Appeals Council remarked that ALJ Greisler assigned great weight to the May 27, 2015 opinion of John Alley, M.D., who opined that Plaintiff would be capable of standing for less than two hours in a workday and walking for less than two hours in a workday, yet she found that Plaintiff was capable of sedentary work. *See id.* The Appeals Council asserted that the full range of sedentary work requires that an individual be able to stand and walk for a total of approximately two hours during an eight-hour workday. *See id.* Thus, the Appeals Council ordered further consideration of Dr. Alley's opinion to determine whether Plaintiff's limitations would significantly erode the occupational base of unskilled sedentary work. *See id.* at 161-162.

The Appeals Council further ordered that, upon remand, the new ALJ must "[o]btain additional evidence concerning [Plaintiff's] impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence," "[g]ive further consideration to [Plaintiff's] maximum residual

functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations," and "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base[.]" *See id.* at 162. The Appeals Council also noted that Plaintiff raised a challenge under the Appointments Clause of the Constitution, U.S. Const. Art. II, § 2, cl., 2, to the manner in which ALJ Greisler was appointed. *See id.* The Appeals Council remanded the case to a different ALJ and additionally remarked that the defect was cured because, on July 16, 2018, the Acting Commissioner of Social Security ratified all ALJ appointments and approved them as her own under the Constitution. *See id.* Finally, in compliance with the Appeals Council's directives, it ordered the new ALJ to offer Plaintiff an opportunity for a new hearing and to "take any further action needed to complete the administrative record and issue a new decision." *See id.* at 163.

As a result, Plaintiff appeared with his attorney at a telephone hearing – due to the COVID-19 pandemic – on October 13, 2020, before ALJ John P. Ramos. *See id.* at 39-70. A medical expert and a VE also testified at the hearing. *See id.*

On October 27, 2020, ALJ Ramos issued a written decision on remand from the Appeals Council, in which he made the following findings "[a]fter careful consideration of the entire record…"

1) Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2023."

2) Plaintiff "has not engaged in substantial gainful activity since January 1, 2012, the alleged onset date."

3) Plaintiff "has the following severe impairments: depressive disorder; post-traumatic stress disorder (PTSD); anxiety disorder; cognitive disorder/traumatic brain injury; Asperger's syndrome; and obesity."

4) Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."

5) Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can frequently reach, handle, finger, and feel bilaterally; can occasionally move his head and neck to look up, look down or side to side.  He can sit no more than 45 minutes at a time and then would need to change positions to stand or walk for 10 minutes.  [Plaintiff] retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks and regularly attend to a routine and maintain a schedule.  [Plaintiff] can interact with supervisors on an occasional basis throughout the workday after learning [his] job duties from an instructional or demonstration lesson. [Plaintiff] can work in proximity to coworkers but should only have brief occasional interaction with them.  [Plaintiff] should have no contact with the public.  [Plaintiff] can make decisions directly related to the performance of simple work and handle usual work place changes and interactions associated with simple work.  [Plaintiff] should work in a position where [he is] not responsible for the work of or required to supervise others.  [Plaintiff] should work in a position with little change in daily work processes or routines."

6) Plaintiff "is unable to perform any past relevant work."

7) Plaintiff "was born on August 5, 1970 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  [Plaintiff] subsequently changed age category to closely approaching advanced age."

8) Plaintiff "has at least a high school education."

9) "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is 'not disabled,' whether or not [Plaintiff] has transferable job skills."

10) "Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."

11) Plaintiff "has not been under a disability, as defined in the Social Security Act, from January 1, 2012, through the date of this decision."

*See* AR at 18-30 (citations omitted).

Plaintiff then commenced this action on May 3, 2021, filing a supporting brief on November 3, 2021.  *See* Dkt. Nos. 1, 11.  Defendant filed a responsive brief on March 7, 2022. *See* Dkt. No. 16.  In support of his motion, Plaintiff argues that ALJ Ramos (1) should have found that Plaintiff met the Listed Impairments under 20 C.F.R. Appendix 1 Subpart P of Part 404 §§ 12.02, 12.04, and 12.15; (2) should have afforded greater persuasiveness to treating physician Dr. Langfitt's opinion; (3) erred in affording only "limited weight" to treating physician Dr. Alley's opinion; (4) erred in failing to make any findings regarding Plaintiff's ability to remain on task; and (5) erred in finding that Plaintiff's RFC did not preclude him from the jobs of Office Helper, Marker, and Routing Clerk.  *See generally* Dkt. No. 11.

## III. DISCUSSION

### A.  Standard of review

Absent legal error, a court will uphold the Commissioner's final determination if there is substantial evidence to support it.  *See* 42 U.S.C. § 405(g).  The Supreme Court has defined substantial evidence to mean "'more than a mere scintilla'" of evidence and "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).  Accordingly, a reviewing court "'may not substitute [its] own judgment for that of the [Commissioner], even if [it] might justifiably have reached a different result upon a de novo review.'"  *Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 52 (2d Cir. 2016) (Summary Order) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).  In other words, "[t]he substantial evidence standard means once an ALJ finds facts, [a reviewing court may] reject those facts 'only if a

- 6 -

reasonable factfinder would *have to conclude otherwise*.'"  *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 448 (2d Cir. 2012) (quotation and other citation omitted).

      To be eligible for benefits, a claimant must show that he suffers from a disability within

the meaning of the Act.  The Act defines "disability" as an inability "to engage in any

substantial gainful activity [("SGA")] by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§ 1382c(a)(3)(A).  To determine if a claimant has sustained a disability within the meaning of

the Act, the ALJ follows a five-step process:

1) The ALJ first determines whether the claimant is currently engaged in SGA.  *See* C.F.R. §§ 416.920(b), 416.972.  If so, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(b).

2) If the claimant is not engaged in SGA, the ALJ determines if the claimant has a severe impairment or combination of impairments.  *See* 20 C.F.R. § 416.920(c).  If not, the claimant is not disabled.  *See id.*

3) If the claimant has a severe impairment, the ALJ determines if the impairment meets or equals an impairment found in the appendix to the regulations (the "Listings").  If so, the claimant is disabled.  *See* 20 C.F.R. § 416.920(d).

4) If the impairment does not meet the requirements of the Listings, the ALJ determines if the claimant can do his past relevant work.  *See* 20 C.F.R. § 416.920(e), (f).  If so, the claimant is not disabled.  *See* 20 C.F.R. § 416.920(f).

5) If the claimant cannot perform his past relevant work, the ALJ determines if he can perform other work, in light of his RFC, age, education, and experience.  *See* 20 C.F.R.  § 416.920(f), (g).  If so, then he is not disabled.  *See* 20 C.F.R. § 416.920(g).  A claimant is only entitled to receive benefits if he cannot perform any alternative gainful activity.  *See id.*

For this test, the burden of proof is on the claimant for the first four steps and on the

Commissioner for the fifth step if the analysis proceeds that far.  *See Balsamo v. Chater*, 142

F.3d 75, 80 (2d Cir. 1998) (citation omitted).

**B.  Whether Plaintiff's impairments met Listings 12.02, 12.04, or 12.15**

Plaintiff argues that the credible evidence in the record shows that he meets Listings 12.02, 12.04 and 12.15.  *See* Dkt. No. 11 at 13-15.  Plaintiff contends that he satisfies Listing 12.02(A) because he has a neurocognitive disorder with medical documentation of a significant cognitive decline from a prior level of functioning.  *See id.* at 13-14.  Specifically, he asserts that John Langfitt, Ph.D. noted his severely defective visual spatial learning and memory and indicated that there was evidence in Plaintiff's history suggesting impairment in some aspects of high-level executive functioning, such as multitasking, organization, and planning.  *See id.* Plaintiff also points out that Dr. Langfitt remarked that Plaintiff reported some learning problems before his 1997 motor vehicle accident that caused a traumatic brain injury ("TBI"), and the accident might have exacerbated them.  *See id.*  Plaintiff also argues that he meets the requirements of Listing 12.04(A) because he has depressive disorder coupled with anhedonia and sleep disturbance, as well as poor concentration, loss of energy, and feelings of hopelessness and helplessness.  *See id.* at 14.  According to Plaintiff, opinions from consultative psychologist Jeanne Shapiro, Ph.D., treating therapist Maelea von Hunke, L.C.S.W., and treating nurse practitioner Melinda Myers, N.P. all support this finding.  *See id.*  Plaintiff further asserts that he meets the requirements of Listing 12.15(A) because he suffers from PTSD stemming from sexual abuse when he was 12 years old, and he suffers from flashbacks to his abuse, experiences overall avoidance of people, is shy and untrusting of people, and experiences hypervigilance, isolation, angry outbursts, and negative beliefs about himself and others.  *See id.* at 14-15.  Plaintiff points to N.P. Myers's and Therapist von Hunke's opinions, as well as an opinion from Efrain Agama, M.A., L.M.F.T., to support these findings.  *See id.* at 15.

Additionally, Plaintiff references Listings 12.02(B), 12.04(B), and 12.15(B), which a claimant satisfies if he has marked limitations in two, or an extreme limitation in one, area of understanding, remembering, or applying information; interacting with others, concentrating, persisting, or maintaining pace; and adapting or managing oneself. *See id.*  Since Dr. Langfitt indicated the equivalent of marked limitations in concentration, persisting, or maintaining pace and adapting or managing oneself, Plaintiff argues that ALJ Ramos should have found that he met Part B of the Listings. *See id.*  Having satisfied parts A and B of the Listings, Plaintiff contends that he has established that he is disabled.

ALJ Ramos concluded that the severity of Plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal the criterial of Listings 12.02, 12.04, 12.06, 12.10, and 12.15.[2] *See AR at 19.*  With respect to understanding, remembering, or applying information, ALJ Ramos found that Plaintiff only had "mild limitations" in that he alleged difficulty remembering generally, completing tasks, and paying bills. *See id.*  However, ALJ Ramos noted that Plaintiff could also prepare meals, pay bills, go to doctor's appointments, take medications, shop, and drive, and was able to provide information about his health, describe his prior work history, follow instructions from healthcare providers, and respond to questions from medical providers. *See id.*  ALJ Ramos also found that Plaintiff had "moderate limitations" in interacting with others, based on Plaintiff's alleged difficulty in getting along with others and notwithstanding the fact that Plaintiff could shop and spend time with his friends and family. *See id.*  ALJ Ramos also found that Plaintiff had "moderate limitations" in his ability to concentrate, persist, or maintain pace. *See id.*  He noted that Plaintiff complained

---

[2] Plaintiff does not assert in his Memorandum of Law that he satisfies Listings 12.06 or 12.10. *See generally* Dkt. No. 11 at 13-15.

of limitations in completing tasks, yet he could drive, prepare meals, use the internet, and handle his own medical care; and the record failed to show any mention of distractibility or an inability to complete testing that assesses concentration and attention.  *See id.*  Finally, ALJ Ramos concluded that Plaintiff had "moderate limitations" in his ability to adapt or manage himself.  *See id.*  ALJ Ramos pointed to the fact that Plaintiff had difficulties handling change, but he was able to handle self-care and personal hygiene and appeared to have a normal mood and affect.  *See id.*  Thus, ALJ Ramos asserted that, because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied, and Plaintiff was not disabled.  *See id.*

Plaintiff appears to focus his argument on the fact that he can satisfy the "paragraph A" criteria in the Listings.  However, even assuming without deciding that he could satisfy those factors, Plaintiff must also show that he has marked limitations in two, or extreme limitations in one, of several areas of mental functioning to satisfy the "paragraph B" criteria.[3]  *See* 20 C.F.R. Part 404, Appendix 1, Subpart P at §§ 12.02, 12.04, 12.15.  The only evidence that Plaintiff points to in support of establishing the "paragraph B" criteria is Dr. Langfitt's medical source statement.  *See* Dkt. No. 11 at 15 (citing AR at 964-965).  That medical source statement does not categorize Plaintiff's impairments as mild, moderate, marked, or severe.  *See* AR at 964-965.  Instead, Dr. Langfitt concluded that Plaintiff had serious limitations in, but he was not precluded from performing, certain tasks, such as remembering work-like procedures, carrying out short and simple instructions, making simple work-related decisions, or working in proximity to others.  *See id.*  Plaintiff argues that these serious limitations are comparable to

---

[3] Plaintiff has not attempted to argue that his impairments otherwise satisfy the "paragraph C" factors.  *See* 20 C.F.R. Part 404, Appendix 1, Subpart P at §§ 12.02, 12.04, 12.15.

being markedly impaired in the "paragraph B" categories.  *See* Dkt. No. 11 at 15.  Even if they

are comparable, ALJ Ramos looked at other factors to find that Plaintiff's limitations were not

marked or extreme.

      In his decision, ALJ Ramos looked to Plaintiff's own function report to find that Plaintiff

had mild and moderate limitations.  *See* AR at 19.  In that report, Plaintiff stated that he lived

alone, did not need help with personal care, did not need reminders to take medication, and

could prepare simple meals for himself daily.  *See id.* at 424-426.  Plaintiff received household

support from his mother, his apartment complex, and his Independent Living Skill Trainer for

cleaning, laundry, and household repairs.  *See id.* at 427.  Plaintiff went outside daily, including

by himself, and would drive a car or ride in a car.  *See id.*  Plaintiff explained that he could shop

for groceries for one-hour biweekly.  *See id.*  He was unable to pay bills or handle a savings

account, and instead he benefitted from parental assistance or help from the Independent Living

Skill Trainer.  *See id.* at 428.  With respect to his hobbies and interests, Plaintiff indicated that

he could use a computer for social media and email daily, attended toy tractor shows once per

month, sang country music monthly, and engaged in public speaking through TBI presentations

three times per year.  *See id.*  Plaintiff stated that he felt isolated and had limited social support

with peers, but he regularly contacted his mother and a friend, went to a venue for amateur

musicians, and attended approximately two Co-Dependents Anonymous meetings per month.

*See id.*

      Consultative examiners Dr. Shapiro. and Dennis M. Noia, Ph.D. both opined that

Plaintiff suffered from mild to moderate limitations, which supported ALJ Ramos's conclusions.

*See id.* at 701, 985.  For example, Dr. Shapiro found that Plaintiff had no limitations in

understanding and following simple instructions or performing simple tasks or attending to a

routine and maintaining a schedule.  *See id.* at 701.  She found that he had mild limitations

performing complex tasks, maintaining attention and concentration for tasks, learning new

tasks, making appropriate decisions, and in his ability to consistently relate to and interact well

with others.  *See id.*  Dr. Shapiro further concluded that Plaintiff appeared to have mild to

moderate limitations regarding his ability to deal with stress.  *See id.*  Dr. Noia similarly found

that Plaintiff had no limitations understanding, remembering, or applying simple directions and

instructions, using reasoning and judgment to make work-related decisions, interacting

adequately with supervisors, coworkers and the public, sustaining concentration and performing

a task at a consistent pace, sustaining an ordinary routine and regular attendance at work,

maintaining personal hygiene and wearing appropriate attire, or being aware of normal hazards

and taking appropriate precautions.  *See id.* at 985.  Dr. Noia also found that Plaintiff had mild

to moderate limitations understanding, remembering, or applying complex directions and

instructions and mild limitations in regulating emotions, controlling behavior, and maintaining

well-being.  *See id.*

Similarly, Therapist Agama, who treated Plaintiff, indicated that he had "limited but

satisfactory" abilities to carry out short and simple instructions, maintain attention for two

hours, work in proximity to others, perform at a consistent pace, be aware of normal hazards,

interact appropriately with the general public, maintain socially appropriate behavior, and

adhere to basic standards of neatness and cleanliness.  *See id.* at 1137.  Therapist Agama only

found that Plaintiff was unable to meet competitive standards with respect to dealing with

normal work stress.  *See id.*

Based on the foregoing, the Court finds that there is substantial evidence in the record to

support ALJ Ramos's finding that Plaintiff's limitations are not so severe that they satisfy the

"paragraph B" criteria, and he did not have two marked limitations or one extreme limitation in those criteria. Accordingly, the Court holds that ALJ Ramos did not err in finding that Plaintiff's impairments, singly or in combination with one another, did not meet or medically equal the severity of one of the impairments in the Listings.


**C. Whether ALJ Ramos properly weighed Dr. Langfitt's opinions**

Plaintiff contends that, having filed his claim prior to March 27, 2017, ALJ Ramos was bound by the treating physician rule and therefore should have afforded greater weight to Dr. Langfitt's medical opinions. *See* Dkt. No. 11 at 7-11.[4] The treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see* 20 C.F.R. § 416.927(d)(2) (eff. 2016). Defendant argues, to the contrary, that Dr. Langfitt was not a treating physician, and his opinions were not supported by the substantial evidence in the record. *See* Dkt. No. 16 at 5-10.

In this case, Dr. Langfitt performed a neuropsychological evaluation of Plaintiff in May 2016 and completed a medical source statement in November 2017. *See* AR at 706-710, 962-966. As part of his May 2016 evaluation, Dr. Langfitt concluded that Plaintiff had a "complex neuropsychiatric history and marginal occupational and social functioning." *See id.* at 709. He noted that, in addition to documented PTSD and TBI, Plaintiff reported a family history of Autism Spectrum Disorder ("ASD") and a personal history since early childhood of developmental delay, learning disability, narrow, intense interest in a particular class of objects,

---

[4] The agency has since adopted regulations that eliminated the treating physician rule for claims filed after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 416.927

manual stereotypes, difficulty developing and maintaining peer relationships, and difficulty understanding the feelings and thought processes of others.  *See id.*  Taken together, Dr. Langfitt concluded that Plaintiff's symptoms strongly suggested a diagnosis of ASD at the higher end of intellectual functioning, formerly known as Asperger's syndrome.  *See id.*

Dr. Langfitt noted that Plaintiff's cognitive profile included strong verbal reasoning and weaknesses in visual reasoning, which were exacerbated by Plaintiff's PTSD and TBI.  *See id.* He remarked that it was difficult to distinguish cognitive consequences from Plaintiff's brain injury from more developmentally-based cognitive limitations.  *See id.*  According to Dr. Langfitt, Plaintiff's cognitive and behavioral limitations made it very difficult for him to consistently carry out age-appropriate occupational and social roles; and, although he was able to maintain competitive employment at times, it was always on a part-time basis.  *See id.*  Dr. Langfitt further noted that Plaintiff's employment typically involved fairly rote, repetitive work, which Plaintiff appeared to have performed reasonably well.  *See id.* at 709-710.  However, he acknowledged that Plaintiff had difficulty maintaining positions that required flexibility and problem solving, particularly under time pressure.  *See id.* at 710.  Dr. Langfitt explained that, when pressured, Plaintiff responded in highly socially inappropriate ways.  *See id.* Furthermore, Dr. Langfitt pointed out that the jobs that Plaintiff held were in settings that required minimal social interaction or were relatively tolerant or supportive of atypical social behaviors, such as at a group home, a farm, and driving for the dealership where Plaintiff's parents work.  *See id.*

Based on the forgoing, Dr. Langfitt concluded that Plaintiff would continue to benefit from the vocational and social supports already in place in his life and would continue to benefit from community integration counseling focused on stress management and improving his

emotional and behavioral responses to novel demands and situations. *See id.* Finally, given Plaintiff's diagnoses, social, and occupational history, and his level of cognitive functioning, Dr. Langfitt concluded that it was "very unlikely that [Plaintiff would] be able to obtain and maintain competitive employment on a part-time or full-time basis outside of a supportive setting." *See id.*

In his November 2017 medical source statement, Dr. Langfitt explained that he evaluated Plaintiff once, on May 27, 2016, with a feedback session, and concluded at that time that Plaintiff had ASD and moderate neurocognitive deficits stemming from a TBI. *See id.* at 962. Dr. Langfitt listed Plaintiff's symptoms as including memory deficits, decreased distal dexterity, and socially inappropriate behavior, and his prognosis was stable and unlikely to worsen or improve. *See id.* As a result of Plaintiff's TBI, Dr. Langfitt noted that Plaintiff suffered from loss of consciousness, memory issues, weakness and numbness in his fingers and toes, and had complications with memory and learning. *See id.* Dr. Langfitt further noted that Plaintiff had difficulty deciphering nonverbal signs, trouble following conversations, was unable to organize thoughts and ideas, and struggled with multitasking, organization, and decision-making; however, he noted that each of these were ASD symptoms that were worsened by Plaintiff's TBI. *See id.* Dr. Langfitt further marked that Plaintiff had difficulty with self-control, difficulty in social situations, and suffered from depression and anxiety. *See id.* at 963. He indicated that Plaintiff underwent psychiatric treatment but that it was unlikely to affect his ability to work, and he took medications for his symptoms. *See id.*

In the check-box forms, Dr. Langfitt remarked that Plaintiff was limited, but could satisfactorily maintain regular attendance and punctuality, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance,

and adhere to basic standards of neatness and cleanliness. *See id.* at 964-965. He further noted that Plaintiff was seriously limited, but not precluded, from remembering work-like procedures, understanding, remembering, and carrying out short and simple instructions, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, being aware of normal hazards, traveling to unfamiliar places, and using public transportation. *See id.* Dr. Langfitt found that Plaintiff was unable to meet competitive standards, however, with respect to maintaining attention for two hour segments, sustaining an ordinary routine without special supervision, completing a normal workday or workweek without interruptions from symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, interacting appropriately with the general public, or maintaining socially appropriate behavior. *See id.* Dr. Langfitt ultimately concluded that Plaintiff would be off-task more than 20% of the time in an eight-hour workday and would be absent about four days per month. *See id.* at 965.

In his decision, ALJ Ramos gave Dr. Langfitt's May 2016 opinion – in which he found that Plaintiff performed fairly rote, repetitive work but had difficulty maintaining positions that acquire flexibility, problem solving (particularly under time pressure), and responding in highly socially appropriate ways – "partial weight" because it was "generally consistent" with the nature of Plaintiff's TBI. *See id.* at 24. ALJ Ramos explained that he accounted for Plaintiff's neurological deficits in his RFC by limiting Plaintiff to simple work activity with low levels of work pressure. *See id.* However, ALJ Ramos explained that he did not give greater weight to Dr. Langfitt's May 2016 opinion and gave "limited weight" to his November 2017 medical

source statement because it was not supported by the totality of the evidence in the record, including Dr. Langfitt's own evaluation of Plaintiff.  *See id.*  For example, ALJ Ramos noted that Dr. Langfitt remarked that Plaintiff was alert, oriented, pleasant and cooperative, with no abnormalities of speech or movement, his voice was clear and fluent without evidence of dysarthria or dysphasia, word-finding problems were not obvious in casual conversation, and Plaintiff's thoughts were logical, coherent, and direct without evidence of loose associations, bizarre ideations, hallucinations, or delusions, and his affect was appropriate.  *See id.* at 24-25. Additionally, ALJ Ramos pointed out that Plaintiff denied any signs or symptoms of depression, anxiety, or other major psychiatric disorders, he worked thoroughly and persisted on all tasks and put forth a good effort, and Dr. Langfitt found that he had an average range of general intellectual abilities.  *See id.* at 25.  ALJ Ramos further noted that Dr. Langfitt "only evaluated [Plaintiff] for disability-related purposes, and did not provide him with treatment[.]" *See id.*

"The Second Circuit has explained that the ALJ gives a treating physician controlling weight because of the 'continuity of treatment he provides and the doctor/patient relationship he develops[.]'" *Gabriel C. v. Comm'r of Soc. Sec.*, No. 6:18-CV-671 (ATB), 2019 WL 4466983, \*11 (N.D.N.Y. Sept. 18, 2019) (Baxter, M.J.) (quoting *Weathers v. Colvin*, No. 3:15-CV-575(FJS), 2017 WL 177649, at \*5 (N.D.N.Y. Jan. 17, 2017) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983))).  "However, a physician who only examines a plaintiff 'once or twice' does not develop the requisite physician/patient relationship to support the conclusion that he is a treating physician." *Id.* (citation omitted).  "Similarly, in *Petrie v. Astrue*, the Second Circuit found that failing to give controlling weight to a physician who had 'limited and remote' contact with the patient was not error." *Id.* (quoting 412 Fed. App'x 401,

405 (2d Cir. 2011)).  In this case, Dr. Langfitt only evaluated Plaintiff on one occasion with a feedback session.  *See* AR at 962.  That is exactly the kind of limited and remote contact with a patient that does not create a physician-patient relationship.  As such, the Court finds that the treating physician rule does not apply, and ALJ Ramos was not required to give Dr. Langfitt's opinion controlling weight.

With respect to the weight ALJ Ramos gave Dr. Langfitt's opinions as a non-treating physician, the Court finds that ALJ Ramos's conclusions are appropriate given the other evidence in the record and Dr. Langfitt's notes from his psychiatric evaluation.  For example, Dr. Langfitt concluded that Plaintiff was unable to obtain and maintain competitive employment on a part-time or full-time basis outside of a supportive setting.  *See id.* at 10.  He also remarked in his medical source statement that Plaintiff was unable to meet competitive standards in sustaining an ordinary routine or accepting instructions and responding appropriately to criticism.  *See id.* at 964-965.  However, these conclusions are inconsistent with Dr. Langfitt's finding that Plaintiff functioned in the average range of general intellectual abilities and that he was able to maintain part-time, competitive employment that involved fairly rote, repetitive work, and he appeared to have performed that work "reasonably well."  *See id.* at 708-710.  In Plaintiff's testimony in 2020, he explained that he started his job driving for a car dealership five years earlier, and he worked up to twenty hours per week.  *See id.* at 51-52.  He also explained that he previously drove railroad workers, and he only lost that job because the company lost its contract.  *See id.* at 53-54.  Plaintiff also holds a bachelor's degree from SUNY New Paltz in sociology and completed about 15 credit hours of a Master's degree in special education.  *See id.* at 78-79, 698.  Dr. Shapiro, who, like Dr. Langfitt, examined Plaintiff psychiatrically on one occasion, also found that his intellectual functioning was "in the average

range" and he had an appropriate general fund of information based on his experience. *See id.*

at 701.  Looking at all of the facts in the record and Dr. Langfitt's own findings, the Court

concludes that ALJ Ramos did not err in giving Dr. Langfitt's May 2016 opinion "partial

weight" and his November 2017 opinion "limited weight."


**D.  Whether ALJ Ramos properly weighed Dr. Alley's opinions**

      Plaintiff argues that ALJ Ramos erred in affording only "limited weight" to treating-

physician Dr. Alley's November 2017 opinion that Plaintiff would need to rest during a

hypothetical eight-hour workday in excess of the typical breaks, would be off-task more than

20% of the time given Plaintiff's impairments, could only sit for about four hours and stand or

walk for less than two hours in an eight-hour workday, would need to take 15 to 20 minute

breaks every two to four hours, could rarely lift or carry ten pounds, and would likely miss more

than four workdays a month as a result of his impairments.  *See* Dkt. No. 11 at 11-12.  Plaintiff

contends that Dr. Alley's opinions were well supported by treatment notes and consistent with

the record, including opinions from N.P. Myers and consultative examiner Dr. Lorensen.  *See*

*id.* at 12.

      As stated above, the treating physician rule requires the ALJ to give an opinion from a

claimant's treating physician "controlling weight" if it is consistent with the evidence in the

record.  *See Shaw*, 221 F.3d at 134; *see* 20 C.F.R. § 416.927(d)(2) (eff. 2016).  Treating

physicians are "'not afforded controlling weight where … the treating physician issued opinions

that are not consistent with other substantial evidence in the record, such as the opinions of

other medical experts.'"  *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary

order) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)).  An ALJ

may also properly afford less than controlling weight to a treating physician's medical source statement where the "medical source statement conflict[s] with his own treatment notes[.]" *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order).

An ALJ who refuses to give controlling weight to a treating physician's opinion must consider various "factors" to determine how much weight to give that opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). These factors include the following: "'(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)) (other citations omitted). The Second Circuit has held, however, that ALJs are not required to evaluate each of these factors individually in their decisions. *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004) (per curiam) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed")).

The parties do not dispute that Dr. Alley was Plaintiff's treating family practitioner. The record includes Plaintiff's treatment notes with Dr. Alley from May 2011 to August 2017. *See* AR at 804-887. Dr. Alley repeatedly noted that Plaintiff had no signs of acute distress, normal exams of his neck and extremities, and he was alert and oriented. *See id.* at 804-809, 816, 824, 828, 832, 843, 847, 855, 861, 872, 877, 879, 883, 887. He remarked that Plaintiff walked with a limping gait with his left leg short and turned in at the hip. *See id.* at 807, 824. Dr. Alley also described this as a "markedly right antalgic gait," a "2+ left abductor lurch gait," and a

"markedly left antalgic gait." *See id.* at 847, 855, 861, 866. Plaintiff reported depression and suicidal thoughts, but he denied suicide attempts and was going to counseling and support groups. *See id.* at 808, 815, 849, 871. Plaintiff also reported to Dr. Alley that his anxiety and depression were "under control," although he had some anger issues. *See id.* at 823. Dr. Alley believed that Plaintiff was physically and emotionally qualified to drive without hazard to himself and others. *See id.* at 810-811. Plaintiff explained that he exercised two or three times per week in that he went for walks for thirty minutes at a time, and he was working to improve his exercise routine. *See id.* at 827, 831, 835, 842, 886. He also reported swimming once per week for exercise. *See id.* at 854, 878. Plaintiff reported that he did not have daily pain when walking, but he experienced left hip discomfort with weather changes. *See id.* at 846. Dr. Alley noted that Plaintiff had no limitations and had a "regular duty" work status. *See id.* at 846, 878. Plaintiff also reported to Dr. Alley that, in addition to mild hip pain, he could not lift over 50 pounds, could not run, had difficulty bending, and could not stand for long periods of time. *See id.* at 854.

In a May 2015 medical report for determination of disability, Dr. Alley indicated that Plaintiff had been diagnosed with TBI, a hip fracture, and a wrist fracture. *See id.* at 852. He opined that Plaintiff could lift a maximum of 50 pounds and frequently lift 25 pounds. *See id.* He also determined that Plaintiff could carry a maximum of 20 pounds and frequently carry 10 pounds. *See id.* Dr. Alley marked that Plaintiff could stand for less than two hours per day, walk for less than two hours per day, and sit for six hours per day. *See id.* Plaintiff did not have any sensory, manipulative, or environmental limitations, but he was limited in stooping, bending, crouching, squatting, and climbing. *See id.* Plaintiff also had limitations in understanding, carrying out, and remembering instructions. *See id.*

In his November 2017 medical source statement, Dr. Alley indicated that he saw Plaintiff every four months, Plaintiff was diagnosed with TBI and depression, and his symptoms included depression, fatigue, trouble focusing, and trouble concentrating. *See id.* at 957. Plaintiff also suffered from anxiety, memory issues, and cognitive problems that affected his memory, learning, reasoning, problem solving, speed of mental processing, attention, concentration, multitasking, organization, and decision-making. *See id.* Dr. Alley remarked that Plaintiff also had communication problems that included trouble reading cues from listeners, following conversations, and an inability to organize his thoughts and ideas. *See id.* Plaintiff had difficulties in social situations in addition to his depression, anxiety, mood swings, irritability, and anger. *See id.* at 958. Dr. Alley noted that Plaintiff was being treated with antidepressants. *See id.* He also remarked that Plaintiff could sit for 45 minutes at a time up to four hours in an eight-hour workday and stand for 10 minutes at a time for less than two hours in an eight-hour workday. *See id.* Dr. Alley opined that Plaintiff would need to take unscheduled breaks every two to four hours in an eight-hour workday that would last 15 or 20 minutes. *See id.* He further opined that Plaintiff could frequently use his hands, fingers, and arms for grasping, turning, twisting, reaching, and doing fine manipulations. *See id.* at 959. He could occasionally lift less than 10 pounds, rarely lift 10 or 20 pounds, and never lift 50 pounds. *See id.* Dr. Alley stated that Plaintiff could rarely look down, turn his head left or right, or look up, and he could occasionally hold his head in a static position. *See id.*

Dr. Alley also opined that Plaintiff was limited but satisfactory in maintaining regular attendance, sustaining an ordinary routine, making simple work-related decisions, asking simple questions, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers, responding appropriately to changes in a routine work setting,

being aware of normal hazards, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, traveling in unfamiliar places, and using public transportation.  *See id.* at 959-960.  Dr. Alley believed that Plaintiff was seriously limited, but not precluded, from remembering work-like procedures, understanding, remembering, and carrying out short and simple instructions, maintaining attention for two hours, working in coordination with or proximity to others, dealing with normal work stress, and interacting appropriately with the general public.  *See id.*  He also concluded that Plaintiff was unable to meet competitive standards in completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a pace consistently and without an unreasonable number and length of rest periods.  *See id.*  Dr. Alley remarked that Plaintiff "has tried and failed in the past to work 8 hours a day full time," and his anxiety makes new situations difficult.  *See id.* at 960.  With respect to his physical disabilities, Dr. Alley noted that Plaintiff had a "severe pelvis/left hip injury," which limited his walking and standing.  *See id.*

Finally, in his October 2020 medical source statement, Dr. Alley noted that he saw Plaintiff two or three times per year and had done so for fourteen years, and he had diagnosed Plaintiff with, among other things, TBI and a left hip injury.  *See id.* at 1141.  Dr. Alley remarked that Plaintiff's prognosis was poor, and he had "problems with memory, focus, concentration, depression and fatigue, [and] left hip pain."  *See id.*  He opined that Plaintiff could sit or stand for 15 minutes at a time in an eight-hour workday, that Plaintiff could stand or walk for less than two hours, and he could sit for about two hours total in an eight-hour workday.  *See id.* at 1141-1142.  Dr. Alley indicated that Plaintiff would need a job that permitted shifting positions at will throughout the day, and that he would need unscheduled

breaks every 30 to 60 minutes for a period of 10 to 15 minutes during an eight-hour workday.

*See id.* at 1142-1143.  He also opined that Plaintiff would be off-task more than 20% of the time

and that he would be absent more than four days per month.  *See id.*  Dr. Alley indicated that

Plaintiff's TBI severely limited his focus and concentration.  *See id.*  Dr. Alley also concluded

that Plaintiff could occasionally look down, turn his head right or left, hold his head in a static

position, grasp or turn objects with his hands, use fine manipulations, and reach with his arms.

*See id.* at 1142.  He further found that Plaintiff could rarely lift less than ten pounds, climb

stairs, and look up.  *See id.*  He lastly noted that Plaintiff could never lift ten pounds or more,

twist, stoop, bend, crouch, squat, or climb ladders.  *See id.*

     ALJ Ramos gave "partial weight" to Dr. Alley's May 2015 opinion and "limited weight"

to his November 2017 opinion.  *See id.* at 22.  ALJ Ramos explained that he gave Dr. Alley's

May 2015 opinion "partial weight" because he provided Plaintiff with treatment on a regular

basis for an extended period of time and it was "somewhat consistent with the dearth of

treatment for [Plaintiff's] obesity, and is somewhat supported by the abnormal clinical findings

showing an abnormal gait."  *See id.*  ALJ Ramos also found that Plaintiff's mental limitations

that Dr. Alley identified in his May 2015 opinion were "consistent with the neuropsychological

evaluation."  *See id.*

     ALJ Ramos pointed out that, in Dr. Alley's November 2017 opinion, he concluded that

Plaintiff could only work on a part-time basis; however, ALJ Ramos found that this was

contradicted by Plaintiff's work history during the period under review that, at times, exceeded

part-time hours.  *See id.*  ALJ Ramos asserted that, at his previous hearing, Plaintiff had testified

that he worked up to 35 hours a week during the period under review.  *See id.* at 23.  He

asserted that there was no indication in the record that Plaintiff was frequently absent from work

- 24 -

or missed scheduled appointments, which undermined Dr. Alley's conclusion that Plaintiff would be absent from work more than four days per month.  *See id.*  Additionally, ALJ Ramos noted that Dr. Alley did not provide any basis for Plaintiff's limitations in sitting, standing, and walking in his November 2017 opinion.  *See id.* at 22.  ALJ Ramos noted that Dr. Alley's progress notes indicated that Plaintiff walked with a normal gait and his neck was normal to inspection, "which contradicts the limitations Dr. Alley identified for standing, walking, and the neck."  *See id.*

Moreover, ALJ Ramos noted that Dr. Alley's opinions "suggest[ed] that [Plaintiff's] conditions ha[d] deteriorated during the period under review, but the treatment records from his office d[id] not support such a finding."  *See id.* at 23.  Looking at examinations from May 2012 and August 2017, ALJ Ramos pointed out that Plaintiff continuously denied experiencing side effects from medication, any constitutional, cardiovascular, gastrointestinal, musculoskeletal, or neurological symptoms, and denied experiencing dyspnea, edema, fatigue, orthopnea, chest pain, or palpitations.  *See id.*  As such, ALJ Ramos stated that Plaintiff's "examinations undermined the significant functional limitations Dr. Alley had identified in his more recent assessments."  *See id.*

With respect to Dr. Alley's October 2020 opinion, ALJ Ramos gave it "limited weight" because he had opined that Plaintiff could sit or stand for 15 minutes at one time, could stand or walk for less than two hours during an eight-hour workday, and sit for about two hours in an eight-hour workday, which his treatment records of Plaintiff did not support.  *See id.*  ALJ Ramos further noted that the record revealed that Plaintiff was never in any acute distress, had a normal gait and stance, had full range of motion of his lower extremities, and there was no indication that Plaintiff was frequently absent from work or missed scheduled appointments,

"which undermine[d] Dr. Alley's conclusion that [Plaintiff] would be absent from work more than four days per month."  *See id.* at 24.

ALJ Ramos explained that the reasons he did not afford Dr. Alley's opinions controlling weight were because they lacked consistency and supportability in the record.  *See id.* at 22-24. ALJ Ramos pointed to the fact that, other than an antalgic gait and some left hip pain, Plaintiff had no musculoskeletal issues and full range of motion in his lower extremities in Dr. Alley's treatment notes.  *See id.* at 23-24.  Dr. Alley also frequently remarked that Plaintiff was not in acute distress.  *See id.* at 22-24.  These notations were inconsistent with Dr. Alley's ultimate recommendations that Plaintiff be severely limited in sitting, standing, walking, twisting, stooping, bending, crouching, squatting, climbing ladders, and climbing stairs.  Furthermore, ALJ Ramos pointed out that Plaintiff's neck always appeared normal, yet Dr. Alley limited him in looking up and down, left and right, and holding his head in a static position.  *See id.* at 22. In addition to these inconsistencies, ALJ Ramos noted that Plaintiff's increased limitations from May 2015 through October 2020 were not supported by the record, which did not show that Plaintiff had any serious deterioration or worsening of symptoms.  *See id.* at 23.

ALJ Ramos also pointed to other opinions from Kalyani Ganesh, M.D., a consultative orthopedic examiner, and N.P. Myers, which contradicted Dr. Alley's opinions.  *See id.* at 23-24.  For example, ALJ Ramos noted that Dr. Ganesh found that Plaintiff did not have any limitations in lifting, carrying, sitting, standing, walking, reaching, handling, fingering, pushing, pulling, or in operating foot controls, and he had a normal gait, had 5/5 strength, full range of motion in his hips, knees, and ankles bilaterally, and his straight leg raising was negative bilaterally.  *See id.* at 23.  Furthermore, N.P. Myers also treated Plaintiff, and her treatment notes revealed that Plaintiff's attention and concentration were sufficient, he did not have

evidence of psychosis, gave no indication of suicidal or homicidal ideation, and his impulsivity,

judgment, and insight were all unremarkable.  *See id.* at 24.  She also noted that, despite a

blunted affect, Plaintiff reported that he was "doing well," and his medications were controlling

his depression and anxiety.  *See id.*  This evidence further supports ALJ Ramos's finding that

Dr. Alley's opinions were inconsistent and unsupported both by his own treatment notes and the

record as a whole.  As such, the Court finds that ALJ Ramos did not err in failing to give Dr.

Alley's opinions "controlling weight."


E.  **Whether ALJ Ramos erred in failing to make any findings regarding Plaintiff's ability
    to remain on task**

     Plaintiff next contends that ALJ Ramos erred because he failed to make any findings

regarding Plaintiff's ability to remain on task during the ten-minute intervals that he would need

to stand or walk after a 45-minute period of sitting.  *See* Dkt. No. 11 at 16-17.  Plaintiff points

to the VE's testimony that employers would not tolerate off-task behavior beyond 15% of the

workday.  *See id.* at 17.  According to Plaintiff, ten minutes in changing positions out of every

55 minutes (45 minutes sitting and 10 minutes standing/walking) equals 18% of time off-task,

which exceeds the 15% limitation that the VE set in response to ALJ Ramos's questioning.  *See

id.*  Defendant responds that there is no evidence that Plaintiff's symptoms would render him

unable to stay on task during or after a position switch; and, thus, his argument fails.

     In ALJ Ramos's RFC analysis, he found that Plaintiff could "sit no more than 45

minutes at a time and then would need to change positions to stand or walk for 10 minutes."

*See* AR at 20.  Notably, Dr. Alley indicated in November 2017 that Plaintiff could sit for 45

minutes and stand for 10 minutes.  *See id.* at 958.  He also remarked that Plaintiff would be off-

task more than 20% of the time.  *See id.* at 960.  Dr. Langfitt similarly concluded that Plaintiff

would be off-task more than 20% of the time.  *See id.* at 965.  Other examiners, including Dr. Lorensen and Dr. Ganesh, found that Plaintiff had no limitations in sitting, standing, or walking. *See id.* at 693, 979.  ALJ Ramos gave Drs. Lorensen's and Ganesh's opinions "great" and "significant" weights, respectively, even though he ultimately found that Plaintiff was more limited than the doctors opined.  *See id.* at 22-23.

The record therefore discusses Plaintiff's need to change positions, "but there is a conspicuous absence of any mention that Plaintiff's symptoms render [him] unable to remain on task while switching positions."  *Sandra D. v. Comm'r of Soc. Sec.*, No. 5:20-CV-1067 (LEK/ATB), 2022 WL 344058, *6 (N.D.N.Y. Feb. 4, 2022) (Kahn, S.J.).  "It is not the case that there is simply no discussion of [his] sitting and standing or being off-task, which could necessitate remand to fill in gaps in the record."  *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information")).  "Rather, the record does address the issue, but conspicuously lacks any mention of the necessity of greater limitation, that Plaintiff cannot remain on task during or after a position switch."  *Id.*  The Court therefore finds that ALJ Ramos was entitled to rely on all of the evidence in the record to find that Plaintiff could remain on task during those ten-minute position switches; and, therefore, the Court concludes that there was no need for ALJ Ramos to account for off-task time in his RFC finding.

## F.  Whether ALJ Ramos's RFC determination precludes Plaintiff from working as an Office Helper, Marker, and Routing Clerk

Finally, Plaintiff argues that ALJ Ramos's RFC determination precludes Plaintiff from working as an Office Helper, Marker, or Routing Clerk because they require a Reasoning Level

2 (requiring the ability to carry out detailed instructions), which is in conflict with ALJ Ramos's RFC limiting Plaintiff to performing simple instructions and directions. *See* Dkt. No. 11 at 16. Plaintiff asserts that neither ALJ Ramos nor the Appeals Council discussed or acknowledged those discrepancies, nor did either attempt to resolve the conflicts between the VE's description of the positions and the Dictionary of Occupational Titles ("DOT"). *See id.* Thus, Plaintiff contends that Defendant has not met its burden of proof at Step 5 to show that the jobs the VE identified are consistent with ALJ Ramos's RFC findings. *See id.*

Defendant responds that Plaintiff can perform the jobs of Office Helper, Marker, or Routing Clerk because they are all unskilled jobs with Reasoning Level 2, which requires the ability to "'[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.'" *See* Dkt. No. 16 at 15 (quoting Office Helper, *DOT* No. 239.567-010, 1991 WL 672232; Marker, *DOT* No. 209.587-034, 1991 WL 671802; Routing Clerk, 222.687-022, 1991 WL 672133). Defendant contends that there is no conflict between the VE's testimony and the DOT because the ability to perform "simple work," as ALJ Ramos directed in his hypothetical, is consistent with jobs that have Reasoning Level 2. *See id.* at 15.

In his RFC finding, ALJ Ramos concluded that Plaintiff retained the "ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks and regularly attend to a routine and maintain a schedule." *See* AR at 20. ALJ Ramos used those exact mental limitations in the hypothetical that he gave to the VE, from which she concluded that a person with those mental limitations could work as an Office Helper, Marker, or Routing Clerk. *See id.* at 65-66. "[D]istrict courts in this Circuit have found that a limitation to carrying out simple

instructions is not necessarily inconsistent with a reasoning level of three," let alone a reasoning level of two. *Juliana Jolean A. v. Kijakazi*, No. 5:20-cv-1268 (BKS), 2022 WL 595361, *12-*13 (N.D.N.Y. Feb. 28, 2022) (Sannes, J.) (collecting cases).  There is no evidence that the Office Helper, Marker, or Routing Clerk positions, each with a Reasoning Level 2, are inherently incompatible with the mental limitations in Plaintiff's RFC.  Accordingly, the Court concludes that ALJ Ramos did not err in finding that Plaintiff could perform those jobs consistent with his RFC.

## IV. CONCLUSION

Having reviewed the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion for judgment on the pleadings, *see* Dkt. No. 11, is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for judgment on the pleadings, *see* Dkt. No. 16, is **GRANTED**; and the Court further

**ORDERS** that the Commissioner's decision is **AFFIRMED** and Plaintiff's complaint is **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated:  September 26, 2022
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge